## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NGM INSURANCE COMPANY, )<br>       Plaintiff, )<br>)<br>v. )<br>)<br>)<br>LUIS SANTOS, MATTHEW OSTRANDER, and )<br>BARBARA JEAN CREHAN, )<br>       Defendants. ) | Civ. Act. No. 18-11001-TSH |

## MEMORANDUM OF DECISION AND ORDER
### September 1, 2020

**HILLMAN, D.J.**

### Introduction

This is an action under 28 U.S.C. §2201 pursuant to which NGM Insurance Company

("NGM") seeks a declaration of its rights and obligations under an automobile insurance policy it

issued to Barbara Jean Crehan ("Crehan") in regards to a Massachusetts state court lawsuit

brought by Luis Santos ("Officer Santos") against Matthew Ostrander ("Ostrander"). Officer

Santos was injured when Ostrander struck him while driving a 2002 Hyundai Sante Fe ("Sante

Fe"), owned by Crehan. More specifically, NMG seeks: a declaratory judgment that it has the

right to void or rescind the insurance policy it issued to Crehan covering the Sante Fe which

Ostrander was driving at the time that Santos was injured (Count I); a declaration of NGM's

obligation and duties under the policy given that Crehan provided false, deceptive, misleading, or

incomplete information about her household members and/or customary operators which increased NGM's risk of loss (Count II); a declaration that the policy issued by NGM to Crehan does not afford coverage to Ostrander for the claims asserted by Officer Santos because his injuries were intentionally caused by Ostrander and were not the result of an unexpected and/or unintended event (Count III); and for whatever other reason the Court deems fair and just, it declare that NGM is not obligated to afford coverage to Ostrander for Officer Santos's claims (Count IV).

This Memorandum of Decision and Order addresses NGM Insurance Company's Motion for Summary Judgment (Docket No. 50)[1] and Plaintiff, NGM Insurance Company's, Motion To Strike Exhibits 17, 18 And 19 Of Luis Santos' Opposition To Plaintiff's Motion For Summary Judgment (Docket No. 59).   For the reasons set forth below, the motions are *granted*.

## THE MOTION TO STRIKE

As part of his opposition to NGM's motion for summary judgment, Officer Santos has cited to the following three exhibits in support of various factual averments:

1. the deposition of Officer Brian Lewos ("Officer Lewos") who spoke to Crehan via telephone while investigating Ostrander driving Crehan's vehicle into Officer Santos;

2. the deposition testimony of Linda Nilsen ("Nilsen"), an adjuster for NGM, relaying information she obtained from Crehan in a telephone interview regarding the afore mentioned incident; and

---

[1]  Neither Crehan nor Ostrander has filed an opposition to NGM's motion for summary judgment. For the reasons stated on this Memorandum of Decision and Order, I find that NGM is also entitled to summary judgment against them.

3. a recording of statements that Crehan made to Nilsen.

NGM argues that these documents are hearsay, not properly attested and/or are irrelevant. Officer Santos's arguments against striking the various documents are best addressed in context, however, suffice to say he argues that they are relevant and admissible as non-hearsay or under an exception to the hearsay rule.[2]

### **Officer Lewos's Deposition (Exhibit No. 17)**

NGM seeks to strike Exhibit 17, which is the deposition of Officer Lewos who conducted a telephone interview of Crehan while investing the report of a male who had broken into a residence in Millbury, MA on February 11, 2017. When Officer Lewos responded to the residence, the homeowner gave him a description of a male individual and the license plate of a vehicle involved in the burglary. Officer Lewos called Crehan because the car was registered to her. Officer Lewos told Crehan that there may have been an incident involving her car in Millbury but did not go into detail. Crehan told Officer Lewos that her husband, Ostrander "took" the car a couple of days before. Officer Lewos testified that from his conversation with Crehan, it was his "understanding" that Ostrander was using the car with her permission[3]. Officer Santos asserts that the statement that Crehan made to Officer Lewos is admissible first, because it is not being offered to show the truth of the matter, rather it is being offered to show

---

[2] As to all three exhibits, Officer Santos argues that if this Court were to find that Crehan's statements to Officer Lewos and Nilsen regarding Ostrander's use of the Sante Fe are inadmissible hearsay, they should be considered as impeachment evidence pursuant to Fed.R Evid. 613(b) (inconsistent statement of witness). However, to the extent that Crehan's statements to Officer Lewos or Nilsen differ from her deposition testimony, they cannot be admitted as inconsistent statements to impeach her at this stage of the proceedings: "Impeachment serves to challenge a witness' credibility, and we are not to make credibility determinations in deciding motions for summary judgment." *Sarrazine v. L. Karp & Sons*, No. 94 C 3351, 1996 WL 355362, at *16 (N.D. Ill. June 21, 1996).

[3] Although in his written report Officer Lewos wrote that Ostrander borrowed the Sante Fe, at his deposition, he testified that he does not remember Crehan using the word "borrow," rather that is an inference he made from the conversation. Officer Lewos's contemporaneous handwritten notes contain the work "took" referring to Ostrander's possession of the car.

Crehan's state of mind (that she believed Ostrander had the right to use her car at the time of the accident).[4]

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). "It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted." *Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir.2011) (citation to quoted case omitted)(internal quotation marks omitted). Thus, except if the proponent demonstrates that the statements independently fall within a different hearsay exception, witness statements such as those made by Crehan to Officer Lewos are generally excluded under the hearsay rule. *See* Fed.R.Evid. 801, 802. Officer Santos asserts that he is not seeking to admit the statement in order to prove the truth of the matter, *i.e.*, that Crehan had given permission to Ostrander to borrow the Sante Fe, rather he is attempting to use it to establish Crehan's state of mind, *i.e.*, that she believed that Ostrander had the right to use the car. To fall within the state of mind exception set forth in Fed.R.Evid.803(3), the statement must be one "of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." However, it is difficult to comprehend how Crehan's statement is one of her "then-existing state of mind" as opposed to her state of mind when Ostrander first

---

[4] The Court will focus on this argument as Officer Santos's alternative theory, *i.e.*, that the statement falls within the excited utterance exception to the hearsay rule, is meritless as the circumstances do not support a finding that Crehan made the statement in the midst of a "startling event." I so find because Officer Lewos testified that he was careful not to advise Crehan that he was inquiring about who had possession of the car because it may have been used in the commission of a crime. Officer's Santos's argument to the contrary would turn the excited utterance exception on its head as virtually any statement made to a police officer would be admissible hearsay.

took the car—that is, her statement speaks to a past act. *See United States v. Netschi,* 511 F.

App'x 58, 61 (2d Cir. 2013)(to admit statements of one's state of mind with regard to conduct

that occurred earlier would significantly erode the intended breadth of this hearsay exception).

However, it is not necessary for me to resolve this issue as it is clear from Officer Lewos's own

deposition testimony that Crehan never stated to him that Ostrander "borrowed" the car. Rather,

she said he "took" the car and Officer Lewos inferred from their conversation that Ostrander had

permission to use it.   Since the cited evidence does not support Officer Santos's version of the

alleged disputed fact, I will not consider it. NGM's motion to strike Exhibit 17 is *granted*.

### Nilsen's Deposition (Exhibit No. 18) and The Recording

NGM seeks to strike the deposition of Nilsen (Exhibit 18), an adjuster who on its behalf

was investigating the events of February 11th and a recording (Exhibit 19) which memorializes a

conversation Nilsen had with Crehan on April 7, 2017. Citing to the deposition and recording,

Officer Santos asserts that they controvert Crehan's testimony that at the time that Ostrander

struck him, he did not have permission to borrow the Sante Fe. More specifically, Officer Santos

cites to statements that Crehan made to Nilsen that she had permitted Ostrander to use the Sante

Fe so he could look for employment. In juxtaposition to Crehan's alleged statement to Officer

Lewos, Officer Santos does not argue that the statements which Crehan made to Nilsen are

admissible to establish her then existing state of mind, *i.e.*, that she believed that Ostrander had

permission to use the Sante Fe on February 11th. Instead, Officer Santos argues that the

statements to Nilsen and the recording memorializing such statements are admissible under the

residual exception to the hearsay rule, Fed.R.Evid. 807 because the evidence possesses

circumstantial guarantees of trustworthiness.

Pursuant to Rule 807, as amended effective December 31, 2019, the Residual Exception, hearsay is admissible, even if not admissible under one of the Rule 803 or 804 exceptions, if:

> **(1)** the statement is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> **(2)** it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807.

"The First Circuit has emphasized that 'Congress did not intend for the exception to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions or to authorize major judicial revisions of the hearsay rule.'" *Holmquist v. Farm Family Cas. Ins. Co.*, 800 F. Supp. 2d 305, 311 (D.Me. 2011)(internal punctuation and citation omitted). The exception is to be utilized only in exceptional circumstances and therefore, is rarely applied. *United States v. Trenkler*, 61 F.3d 45, 59 (1st Cir.1995).   "Assessment of whether Rule 807's requirements are met in a given case 'is a fact-specific inquiry,' in which the totality of the circumstances must be examined; '[n]o single factor is dispositive[.]'" *Emhart Indus., Inc. v. New England Container Co.*, No. CA 06-218 S, 2014 WL 5808390, at *2 (D.R.I. Nov. 7, 2014)(internal citation and citation to quoted case omitted). "The proponent of a statement, citing the residual exception, bears a heavy burden." *ADT LLC v. Alarm Prot. LLC*, No. 9:15-CV-80073, 2017 WL 1881957, at *2 (S.D. Fla. May 9, 2017).

First, the Court must determine whether the proffered hearsay evidence is supported by sufficient guarantees of trustworthiness. In making this determination, the Court considers the totality of the circumstances, and whether there is corroborating evidence. In his argument in support of his contention that the statements to Nilsen and corresponding recording are

admissible, Officer Santos focuses on the totality of the circumstances which he contends establishes the necessary sufficient guarantees of trustworthiness.[5] More specifically, he asserts that Crehan's statements to Nilsen have the necessary guarantees of trustworthiness because: (1) she knew that her statement to Nilsen was being recorded by her insurance company and therefore, if anything she said turned out to be false, NGM would have a recording to prove that she had lied; and (2) the statement was taken and recorded by NGM's own employee, Nilsen, who was able to control the taking of the statement, ask exactly the questions that NGM wanted (framed and worded exactly the way NGM wanted), and ask all necessary follow-up questions.

Crehan was not under oath when she made the statement to Nilsen and in response to questioning at her deposition, Crehan stated that she told Nilsen that Ostrander had permission to use the Sante Fe on February 11th because she did not want to get him in trouble, that is, she had reason not to be fully truthful with Nilsen. Considering the totality of the circumstances, primarily that Crehan was not under oath or subject to cross-examination during her conversation with Nilsen, I find that Officer Santos has failed to meet his burden to establish that Crehan's statements to Nilsen sufficient guarantees of trustworthiness such that they are admissible under Rule 807.   NGM's motion to strike Exhibits 18 & 19 is *granted*. Accordingly, the Court will not consider the statements cited by Officer Santos which he alleges creates a genuine issue of

---

[5] "The amendment specifically requires the Court to consider corroborating evidence in the trustworthiness enquiry. …   The rule now provides for a uniform approach and recognizes that the existence or absence of corroboration is relevant to, but not dispositive of, whether a statement should be admissible under this exception. Of course, the court must consider not only the existence of corroborating evidence but also the strength and quality of that evidence." *See* Advisory Comm. Notes to Fed. R. Evid. 807.  Officer Santos does not assert that there is any evidence which would corroborate Crehan's statement to Nilsen. The Court notes that Crehan's statements to Officer Lewos cannot be cited as corroboration because as discussed above, Crehan did not tell Officer Lewos that Ostrander had permission to use the Sante Fe.

material fact as to whether Ostrander had Crehan's permission to drive the Sante Fe on February 11th.

## Facts

### The Policy

NGM issued a Standard Massachusetts Automobile Insurance Policy, Policy No. 21M0019E to Crehan effective January 5, 2017 to January 5, 2018[6].   Crehan was the only person named in Item 1 of the Coverage Selections Page of the Personal Policy Provisions. The Compulsory coverages of the Mass. Policy, including Part 1, Bodily Injury to Others,   provides in relevant part:

> Under this Part, we will pay damages to people injured or killed by **your auto** in Massachusetts accidents. The damages we will pay are the amounts the injured person is entitled to collect for bodily injury through a court judgment or settlement. We will pay only if you or someone else using **your auto** with your consent is legally responsible for the accident. The most we will pay for injuries to one or more persons as a result of bodily injury to any one person in any one accident is $20,000 … .

> Under Part 5, Optional Bodily Injury to Others, the Mass. Policy provides in relevant

part as follows:

> Under this Part, we will pay damages to people injured or killed in accidents if you or a **household member** is legally responsible for the accident. We will also pay damages if someone else using **your auto** with your consent is legally responsible for the accident. The damages we will pay are the amounts the injured person is entitled to collect for bodily injury through a court judgment or settlement.

> This Part is similar to Compulsory Bodily Injury To Others (Part 1). Like the Compulsory Part, this Part pays for accidents involving **your auto** in

---

[6] A copy of the Massachusetts Automobile Policy ("Mass. Policy") is attached as *Exs.1* to the Mem. In Supp. Of Pl., NGM Insurance Company's Mot. For Sum. J. (Docket No. 51)("NGM Memo") and a copy of the Coverage Selection Page and related information issued to Crehan ("Personal Coverage Policy") is attached as *Ex. 2* to the NGM Memo. The Mass. Policy and Personal Coverage Policy which together govern the terms of Crehan's insurance coverage shall collectively be referred to as the "Policy."

Massachusetts. Also like the Compulsory Part, this Part does not pay for the benefit of anyone using an auto without the consent of the owner.

The Optional coverages of the Mass. Policy including Part 5, Optional Bodily Injury to Others, provides in relevant part that "We will not pay under any of the Optional coverages … For injury or damage that is intentionally caused by you, a **household member** or anyone else using **your auto** with your consent." The Policy's Optional Bodily Injury to Others (Part 5) limits are $250,000 per person and $500,000 per accident.

The general provisions of the Mass. Policy provide in relevant part:

**18. False Information**

If you or someone on your behalf gives us false, deceptive, misleading, or incomplete information in any application or policy change request, and if such false, deceptive, misleading, or incomplete information increases our risk of loss, we may refuse to pay claims under any or all of the Optional Insurance Parts of this policy. Such information includes the description and place of garaging of the vehicles to be insured, the names of all **household members** and customary operators required to be listed, and the answers given for all listed operators. We may also limit our payments to those amounts that we are required to sell under the compulsory coverages of this policy.

**19. Changes Which Affect Premium**

If the information contained in your application changes before this policy expires, we have the right to adjust your premium to reflect such changes. You must inform us of any changes which may have a material effect on your insurance coverage or premium charges, including the description, ownership, type of usage and place of garaging of **your auto** and the **household members** and individuals who customarily operate **your auto**.

The Mass. Policy includes the following definitions relevant to the above provisions:

**1. We, Us** or **Our** - refers to the company issuing this policy.

**2. You** or **Your** - refers to the person(s) named in Item 1 of the Coverage Selections Page.

3. **Accident** – means an unexpected, unintended event that causes bodily injury or property damage arising out of the owner- ship, maintenance or use of an auto.

  **....**

**5. Your Auto** - means:

**A.** The vehicle or vehicles described on the Coverage Selections Page.

  **....**

**9. Household Member** - means anyone living in your household who is related to you by blood, marriage or adoption … .

The Personal Coverage Policy listed two autos in the Coverage Selections Page, a 2004

Dodge Caravan ("Caravan") and the Sante Fe. The only driver listed in the policy was Crehan.

The Coverage Selections Page of the Personal Coverage Policy stated:

> **Check carefully that all operators of your auto(s) are shown. Your failure to list a household member or any individual who customarily operates your auto may have very serious consequences.**
>
> **NOTICE: If you or someone else on your behalf has knowingly given us false, deceptive, misleading or incomplete information and if such false, deceptive, misleading or incomplete information increases our risk of loss, we may refuse to pay claims under any or all of the Optional Insurance Parts and we may cancel your policy. Such information includes the description and the place of garaging of the vehicle(s) to be insured, the names of all household members and customary operators required to be listed and the answers given above for all listed operators. We may also limit our payments under Part 3 and Part 4. Check to make certain that you have correctly listed all operators and the completeness of their previous driving records. We may verify the accuracy of the previous driving records of all listed operators.**
>
> **We will not pay for a collision or limited collision loss for an accident which occurs while your auto is being operated by a household member who is not listed as an operator on your policy. Payment is withheld when the household member, if listed, would require the payment of additional premium on your policy because the household member would be classified as an inexperienced operator or would require payment of additional premium on your policy under the Merit Rating Plan.**

Additionally, the Coverage Selections Page of the Personal Coverage Policy listed Crehan's address as 94 School Street, Walpole, MA with a zip code of 02081 and the Place of Principal Garaging for both vehicles as "Walpole" with the zip code of 02081.

<u>Crehan's and Ostrander's Living Arrangements</u>

Crehan married Ostrander in October 2016. They had been living together for roughly eight years before getting married. Within weeks of the marriage, Crehan discovered that after having been sober for the prior seven years, Ostrander had begun using opiates again. Crehan also discovered that Ostrander had sold some of her belongings without telling her to obtain money for drugs. In late November, Crehan gave a notice of termination of their lease on an apartment in Worcester, Massachusetts effective December 31, 2016, and began to make arrangements to move in with a friend in Salisbury, New Hampshire. Ostrander was not going with her to New Hampshire as Crehan had made it clear to him that he had to get off drugs before they could live together again. As of December 15, 2016, Crehan changed the address on her existing auto insurance policy with Safety Insurance Company from the Worcester address to her mother's apartment at 94 School Street, Walpole, Massachusetts. At some point before January 5, 2017, Crehan notified the Registry of Motor Vehicles to change her address on her license and registration from the Worcester apartment address to the Walpole address. The lease on the Worcester apartment ended on December 31, 2016 and from January 1, 2017 to January 9, 2017, Crehan stayed in Sterling, Massachusetts while temporarily house-sitting. After January 9, 2017, she began spending time with her friend in New Hampshire.

Issuance of the Policy

On September 15, 2015, Crehan spoke with Grace Roche ("Roche) an agent at D. Francis Murphy Insurance Agency ("Murphy Agency"). She advised Roche that she was living at 94 School Street in Walpole, Massachusetts with a family member. On October 26, 2016, Roche emailed Crehan and informed her that her insurance carrier, Safety Insurance, would not be renewing her (Crehan's) insurance effective January 5, 2017. Roche spoke to Crehan and explained that Safety Insurance would not be renewing the policy because Ostrander was a household member and it was required that he be listed on the Policy. Roche's contemporaneous records of this conversation reflect that Crehan was "not very happy" that Safety Insurance was not renewing her policy.

Roche informed Crehan that she would be shopping for an auto policy from other insurance companies.   On November 17, 2016, Roche communicated to Crehan the terms of an insurance policy which included coverage for Ostrander. When informed of the terms, Crehan stated that she could not afford the premium cost. According to Roche, Crehan was "very vocal on how expensive" the policy was with Ostrander added. In response, Roche explained to Crehan the reasons and factors that go into the pricing. On November 17, 2016, Roche sent Crehan an email reiterating that "all licensed household members with actives licenses must be listed on the personal auto policy."

On January 5, 2017, Crehan met with Roche at the Murphy Agency. Roche read questions off an NGM insurance application to Crehan and entered her answers on the application. Crehan signed then application at 3:39 pm on January 5, 2017. During the January 5, 2017 conversation, Crehan told Roche that she was living in Walpole with an aunt and that Ostrander was living in Worcester, Massachusetts and asked if the premium could be changed or

altered. Roche questioned Crehan about whether she was sure that Ostrander was no longer a household member and Crehan adamantly assured Roche that they were not seeing each other, she had nothing to do with him, that she was at her aunt's house, and he was in Worcester. Crehan did not tell Roche that her mother lived at the 94 School Street, Walpole address[7]. Roche told Crehan that if Ostrander operated the vehicle, there would be no coverage.

Based on the information Crehan provided, the application listed the address for Crehan as 94 School Street, Walpole, Massachusetts. Two vehicles were listed in the application, the Santa Fe[8] and the Caravan.   The principal place of garaging for both vehicles was listed as "Walpole 02081."   During the application process, Crehan told Roche that she would only be driving and using her vehicles in Massachusetts. As explained in more detail below, applications for insurance for New Hampshire automobile insurance policies are different from those for Massachusetts automobile policies. According to Roche, if Crehan had informed her that she was living outside of Massachusetts and garaging her vehicle outside of Massachusetts, she would not have obtained the Massachusetts NGM policy for her.

The application for the Policy stated in part: "You must notify us of changes that have occurred prior to the renewal of this policy and during the policy period." At the end of the application it states that "I declare that all of the statements contained in this application are true and complete to the best of my knowledge as of this date." Below that statement, Crehan signed her name and dated the application January 5, 2017.

---

[7] Roche recollected that Crehan told her she was living at her aunt's house in Walpole, however, according to Crehan, it was her mother's house. Crehan does not recall what she told Roche.

[8] Crehan was given the Sante Fe by her aunt in December 2016 when her aunt bought a new car. Crehan added the Sante Fe to her insurance policy (which was then with Safety Insurance) at that time.

NGM would not have issued a Mass. Policy to Crehan on January 5th if it knew Crehan would live in New Hampshire and garage a vehicle in New Hampshire starting on January 9, 2017.

Insurance policies written by NGM to cover motor vehicles garaged in New Hampshire ("N.H. Policies") are different from insurance policies written to cover motor vehicles garaged Massachusetts. N.H. Policies include different coverages, different language, and different provisions than Mass. Policies.   If a person has a New Hampshire residence and garages their vehicle in New Hampshire, NGM would issue a N.H. Policy for the New Hampshire garaged vehicle. Thus, if Crehan had informed NGM that she was garaging one vehicle in Walpole, Massachusetts and one vehicle in Salisbury, New Hampshire, NGM would have issued two different policies: one policy with Massachusetts requirements and one policy with New Hampshire requirements.   If all the same information provided in the Massachusetts application had been provided, except Crehan had stated that her address was in Salisbury, New Hampshire instead of Walpole, Massachusetts, the premium for the N.H. Policy would have been $791 higher than what Crehan payed for the Mass. Policy. Prior to February 11, 2017, Crehan never informed NGM that she intended to move or had moved to New Hampshire. Prior to February 11, 2017, Crehan never requested that NGM issue her a N.H. Policy.[9]

Crehan testified at her deposition that she lived with Ostrander through the end of December 2016. She further testified that after January 9, 2017, she was spending part of her

---

[9] Officer Santos contests NGM's assertion that Crehan intended to move to Salisbury, New Hampshire on January 9th asserting that when she signed the insurance application on January 5th, she had not made a commitment to transitioning to New Hampshire. However, Officer Santos's interpretation of Crehan's testimony is incomplete. Her testimony that she had committed to transitioning to New Hampshire concerned where she intended to garage the Sante Fe—from the totality of her testimony, it is clear she intended to reside in New Hampshire as of January 9, 2017, however, she was not certain as to whether she would immediately be garaging the Sante Fe in New Hampshire, or leaving it at her mother's house. Officer Santos accurately cites Crehan's testimony that she had clients and medical appointments in Massachusetts after January 9th and therefore, 2-3 times per week stayed over at her mother's in Walpole. However, such assertions do not create a genuine issue regarding the material fact that as of January 9, 2017, Crehan *resided* in New Hampshire.

14

time at the Walpole apartment. She was staying there when she had medical appointments in

Massachusetts, and when she was working for customers of her dog training business. Most of

her business customers were in Massachusetts at that time. She was traveling back and forth

between New Hampshire and Walpole two or three times a week. The Walpole address was the

address on her Massachusetts driver's license and car registrations.   Crehan had a long history

with the apartment at 94 School Street in Walpole. She first moved into the apartment when she

was in seventh grade. Crehan is now 32 years old, and her mother has been there for about 18

years. Crehan always had access to her mother's apartment. She had keys to the apartment and

maintained a bedroom there. Crehan testified that she used the Walpole address on the policy

application because she did not have any permanent address. Crehan knew that she would get

any mail that was sent to the Walpole address.

    At her deposition, Crehan summarized her living situation on the day of the incident as

follows:

    Q. My understanding is the police asked you where you were living, and
    you told them you were living with your mother; is that correct?

    A. Yeah, because I was going back and forth and everything was still
    registered. My license, my -- the registration, the insurance, everything was still
    having me live in Massachusetts. So I hadn't switched my life over to New
    Hampshire yet. I was back and forth and in and out of the hospital and, you know,
    going – just bouncing back and forth from my mom's to New Hampshire and
    hadn't made that legal sign-over happen yet, which is why it was registered to her
    address.

    Crehan further testified that when she went to New Hampshire on January 10, 2017, she

parked the Santa Fe in Walpole. When she came to Massachusetts after that, she drove her other

car, the Caravan, from New Hampshire to Massachusetts. She then drove the Santa Fe while she

15

was in Massachusetts, and then drove back to New Hampshire in the Caravan. When Ostrander took the Santa Fe prior to the crash, he picked it up in Walpole.

Ostrander's use of the Sante Fe and the Injuries to Officer Santos

On January 19, 2017, Crehan asked Ostrander to drive her to a medical appointment in Brockton, Massachusetts. According to Crehan, Ostrander used to the Santa Fe to drive her from New Hampshire to this appointment. Later that day, they had dinner together after which time Ostrander was instructed to bring the Santa Fe directly back to Crehan's mother's house in Walpole where he was to leave it. Crehan believes that any permission Ostrander had to use to the vehicle terminated on January 19, 2017.   Ostrander acknowledges that he was supposed to return the Santa Fe to Walpole and give the keys to Crehan's mother. However, he continued to use it. At some point prior to the incident with Officer Santos, Ostrander had a conversation with Crehan where he told her he was living in the Santa Fe. According to Ostrander, Crehan told him that he was to park the vehicle and did not give him permission to continue using it. Ostrander testified as follows regarding when he was to surrender the Sante Fe: "Did she [Crehan] give a date when I needed to stop using the car?... Yah, it was like probably 30 seconds after we hang up this phone call."

On February 11, 2017, the Santa Fe was being driven by Ostrander, as he fled from Millbury police officers into Auburn, Massachusetts.   Officer Santos, a police officer with the Auburn Massachusetts Police Department, traveled to the intersection of Route 20 (Washington Street) and Millbury Street in Auburn to deploy his "stop sticks."   Officer Santos parked his cruiser in the area of the intersection and exited his vehicle. Ostrander turned from Washington Street onto Millbury Street and struck Officer Santos who was outside of his cruiser seriously injuring Officer Santos.

16

Officer Bruce Hamm ("Officer Hamm"), a Certified Crash Reconstructionist, investigated the incident, and concluded that Ostrander was not applying his brakes at the time that he struck Officer Santos. Officer Hamm concluded that the Santa Fe struck Officer Santos at a speed of 25 to 30 miles per hour. Officer Santos did not see the vehicle move left or right as it approached him prior to the collision. Officer Santos did not see the vehicle brake, reduce its speed, or sound its horn, nor did he hear the vehicle's tires screech. Ostrander admits that he did not apply the brakes prior to hitting Officer Santos. Following the incident, Officer Santos spoke with fellow Officer John Maclean and reported that the driver of the Santa Fe never attempted to slow down or avoid striking him and that he unnecessarily chose to make a difficult turn onto Millbury Street. Officer Santos also stated that he believed that the Santa Fe's driver purposely struck him with his vehicle and was trying to kill him. Ostrander, however, denies that he intended to strike Officer Santos. Officer Santos has filed suit against Crehan and Ostrander in the Massachusetts Superior Court asserting that he was injured as the result of their careless and negligent conduct.

## Discussion

NGM asserts that it there is no coverage under the Policy because: at the time that he hit Officer Santos, Ostrander did not have permission to be using the Santa Fe; Crehan made a material misrepresentation in her application for insurance regarding the place of garaging of the Sante Fe which increased the risk to NGM; and there is no optional coverage under the Policy because Officer Santos's injuries were the result of an intentional act by Ostrander.

Standard of Review; Interpretation of Insurance Policies

*Summary Judgment Standard*

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of affecting the outcome of the case.'" *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (internal citation and quotation marks omitted).

The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Sensing*, 575 F.3d at 153. "Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial."   *Id.* (citing *Carroll*, 294 F.3d at 236).   These facts must not be merely allegations or denials of the moving party's pleadings. *Id.*   Both "[c]onclusory allegations [and] improbable inferences" are insufficient to overcome summary judgment. *Sensing*, 575 F.3d 153 (citing *Carroll*, 294 F. 3d at 236-37 (internal quotations omitted).   "The test is whether, as to each essential element, there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Sensing,* 575 F.3d at 153 (citations omitted).

*Interpretation of an Insurance Policy*

First, there is no dispute that Massachusetts law applies for purposes of interpreting the Policy. Massachusetts law provides that interpretation of an insurance policy is a question of law for the court. The court applies general rules of contract interpretation, and looks first to the actual policy language, which is "'given its plain and ordinary meaning.'" *Valley Forge Ins. Co. v. Field,* 670 F.3d 93, 2012 (1ˢᵗ Cir. 2012). Like all contracts, an insurance policy is to be construed according to the fair and reasonable meaning of its words. A "'coverage provision is generally entitled to liberal construction in favor of coverage, while an exclusion is subject to a narrow construction against the insurer.'" *A & W Maint., Inc. v. First Mercury Ins. Co.*, 91 F. Supp. 3d 113, 126 (D. Mass. 2015)(citation to quoted case omitted). Accordingly, exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured. *See Vappi & Co.,* 348 Mass. at 431-432, 204 N.E.2d at 276 (1965). Where "the relevant policy provisions are plainly expressed, those provisions must be enforced according to their terms and interpreted in a manner consistent with what an objectively reasonable insured would expect to be covered." *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 11 (1ˢᵗ Cir. 2012)(internal citation omitted). Generally, "[w]here there is more than one rational interpretation of policy language, however, 'the insured is entitled to the benefit of the one that is more favorable to it.'" *Cent. Mut. Ins. Co. v. Bos. Tel., Inc.*, 486 F. Supp. 2d 180, 183 (D. Mass. 2007). However, because the language of standard Massachusetts automobile policies is approved by the Massachusetts Commissioner of Insurance, the general rule that ambiguities are resolved against the insurer, as the drafter of the policy, does not apply. *Oliveira v. Commerce Ins. Co.*, 94 Mass. App. Ct. 276, 279, 112 N.E.3d 1206, 1209 (2018), *review denied,* 481 Mass. 1107, 121 N.E.3d 698 (2019).

*Determining Coverage*

Under Massachusetts law, the duty to defend is broader than the duty to indemnify, and

therefore, a finding that there is no duty to defend generally "negates a duty to indemnify."

*Liberty Mut. Ins. Co. v. Metro. Life Ins. Co.*, 260 F.3d 54, 62 (1st Cir. 2001). However,

> "[w]hereas an insurer's duty to defend is 'measured by the allegations of the
> underlying complaint,' the duty to indemnify is 'determined by the facts, which
> are usually established at trial.' Accordingly, a declaratory judgment is not yet
> ripe for consideration regarding the duty to indemnify where, as here, the
> underlying action has not determined liability or adjudicated factual disputes.
> '[A]ny determination as to the obligation of the insurer to indemnify its insured
> would now be premature and must await the resolution of the underlying claim.'
> A declaration of the [insurer's] duty to indemnify must wait until the underlying
> action is resolved. [The Court] observe[s] at this point, however, that having
> determined there is no duty to defend, there is necessarily no demonstrated basis
> for a duty to indemnify.

*Narragansett Bay Ins. Co. v. Kaplan*, 146 F. Supp. 3d 364, 372 (D. Mass. 2015); *see also*

*Atain Specialty Ins. Co. v. Bos. Rickshaw LLC,* 387 F. Supp. 3d 157, 160 (D. Mass. 2019)(courts

frequently hold that an insurer's duty to indemnify does not become ripe for adjudication until

the underlying lawsuit for liability is resolved). Because the coverage issues raised by NGM are

not dependent on the outcome of the underlying suit, it is not necessary for that litigation to be

resolved before addressing NGM's motion for summary judgment on the issue of coverage.

Whether Coverage is Denied Because Ostrander Did not have Permission to use the Sante Fe

The Policy provisions relevant to this issue provide that NGM will pay a person injured

in an accident with Crehan's vehicle only if she or someone else using her insured auto (in this

case, the Sante Fe) with her consent is legally responsible for the accident. Under this provision,

damages recoverable are capped at $20,000. The Optional Injury provision provides that NGM

will pay damages to people injured in accidents if Crehan *or* a household member is legally

responsible for the accident, or if someone else using her auto with her consent is legally

responsible for the accident. The damages NGM will pay are the amounts the injured person is entitled to collect for bodily injury through a court judgment or settlement, up to a maximum of $250,000.

Although Ostrander stayed with Crehan while was housesitting in Sterling from January 1, 2017 to January 9, 2017, the undisputed facts establish that the couple was estranged thereafter—or at least were not living together. Moreover, while Crehan gave Ostrander permission to use the Sante Fe on January 19, 2017 to drive her to a medical appointment, she revoked that consent later that same day when she instructed Ostrander to bring the Santa Fe back to Crehan's mother's house in Walpole, Massachusetts and leave it there with the keys. When Crehan discovered that Ostrander failed to return the Sante Fe to Walpole[10], she spoke with him by telephone and told him that he was to park the vehicle and stop using it immediately. On this record, the undisputed, admissible facts establish that at the time that he hit Officer Santos,   Ostrander did not have permission to use the Sante Fe. Accordingly, there is no coverage under the Policy. Although I have found that coverage is barred, for the sake of completeness I will address NGM's other arguments as to why it is not obligated to provide coverage for the events of February 11, 2017.

### Whether Crehan Made a Material Misrepresentation that barred Optional Coverage

NGM asserts that at the time Crehan applied for coverage, she represented that the Sante Fe would be garaged in Walpole, Massachusetts knowing that at the time, she was living in Sterling, Massachusetts and within days after the Policy would go into effect, would be moving to New Hampshire. NGM further asserts that had Crehan been truthful on her application, it

---

[10] While it is not clear when this conversation occurred, it took place prior to the incident with Officer Santos.

would have issued a N.H. Policy to cover those vehicles that would be garaged there-- Crehan's misrepresentation increased its risk under the Policy and had it known she was garaging one or more of the vehicles in New Hampshire, she would have been charged a higher premium. NGM argues that it is, therefore, entitled to void the optional coverage provisions of the Policy.

> Under Massachusetts law, a material misrepresentation by the applicant may void an insurance policy. In particular, under section 186 of Massachusetts General Laws chapter 175:
>
> > No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.
>
> For purposes of this statute, a fact is deemed material if it influences the premium. Thus, an insurer may void a policy even if the policyholder made an innocent misrepresentation of material fact if the disclosure of the truth would have affected the insurer's decision in fixing the rate of premium.

*Progressive Direct Ins. Co. v. Martin*, No. CV 18-30014-MGM, 2019 WL 7578399 (D. Mass. Sept. 30, 2019)(internal citations, internal quotation marks and citation to quoted authorities omitted)); *see also Hanover Ins. Co. v. Leeds*, 42 Mass. App. Ct. 54, 57, 674 N.E.2d 1091, 1094 (1997)(misrepresentation in application for insurance will enable insurer to avoid policy if misrepresentation was made with actual intent to deceive, or it is material).   Additionally, "[s]tatements made in an application for insurance are in the nature of continuing representations and speak from the time the application is accepted or the policy is issued." *Hanover Ins. Co.,* 42 Mass. App. Ct. at 57, 674 N.E.2d at 1094.   In general, whether a misstatement made in an application for insurance increased the risk of loss to the insurer and was, therefore, "material" is a question of fact. The insurer bears the burden of proving materiality. *Id.*

Crehan completed the application for insurance on January 5, 2017. At the time, she was house sitting in Sterling, Massachusetts and was intending to move to Salisbury, New Hampshire within the week. Prior to that, she was renting an apartment with Ostrander in Worcester, Massachusetts.[11]  After her move to New Hampshire, Crehan spent 2-3 days per week at her mother's in Walpole for business and medical appointments. At the time that she completed the application and as of the effective date of the Policy, Crehan had not decided whether to leave the Sante Fe at her mother's in Walpole or garage it in New Hampshire. The Sante Fe was primarily garaged in Walpole both before and after Crehan completed the application for insurance. Thus, when Crehan asked Ostrander to drive her to a medical appointment on January 19th, the Sante Fe was in Walpole and later that day, Crehan instructed Ostrander to return the car to Walpole. On this record, there is a genuine issue of material fact both as to where Crehan intended to garage the Sante Fe when she completed the Policy application and where the Sante Fe was garaged after the Policy issued. The question now becomes whether Crehan made a material misrepresentation regarding where the Caravan would be garaged. In making this determination, the Court must bear in mind that the Policy required Crehan to inform NGM if the information contained in her Policy changed where such change could "have a material effect on your insurance coverage or premium charges, including the description, ownership, type of usage and place of garaging of **your auto … .**"

---

[11] It is not clear how long Crehan and Ostrander lived in Worcester. They were living there in November 2016 when because Ostrander had relapsed, Crehan informed him that she was leaving him. When she terminated the Worcester lease at the beginning of December (effective December 31st), she intended to housesit in Sterling until about January 9, 2017 and then move to New Hampshire. At that time, Crehan's vehicle(s) was insured through another insurance company—when she terminated the lease, she notified her insurance company to change her place of garage from Worcester to Walpole.

Crehan testified that after her move to New Hampshire, she was in a state of flux—  she had many medical appointments in Massachusetts, most of her customers for her dog training business were in Massachusetts and she stayed over at the Walpole address at least 2-3 times per week. Moreover, she had not changed her license or registration to the New Hampshire address (they both indicated the Walpole address). However, on this record after January 9, 2017, Crehan was residing in New Hampshire and while she spent a few days a week in Walpole, the principal place of garage of the Caravan was New Hampshire. This is not to say that the record necessarily establishes that Crehan intentionally misrepresented where the Caravan would be garaged. However, NGM has presented evidence that the Policy premium would have been higher if any of the vehicle were garaged in New Hampshire. Thus, under Massachusetts law, that the Caravan was principally garaged in New Hampshire at the time of the incident is a material misrepresentation which permits NGM to void the policy even if the misrepresentation on the application was made innocently. For this additional reason, coverage is barred.

<u>Whether Optional Coverage is Barred because Ostrander Intentionally hit Officer Santos</u>

The optional bodily injury coverage pays for personal injuries accidently caused by an otherwise covered driver (the Court is assuming for purposes of this discussion that Ostrander was a covered driver). The Policy explicitly excludes from coverage "injury or damage that is intentionally caused by you, a **household member** or anyone else using **your auto** with your consent." Additionally, under the Policy an "[a]ccident — means an unexpected, unintended event that causes bodily injury or property damage arising out of the ownership, maintenance or use of an auto." NGM asserts that the record establishes that Ostrander drove directly at Officer Santo, did not apply his brakes or slow down and made no attempt to avoid him and therefore,

evidences an intent to injure Officer Santos. However, the Massachusetts Supreme Judicial Court ("SJC") has held that:

> Generally, injuries resulting from reckless conduct do not fall into the category of 'expected or intended' injuries, but are considered 'accidental' and thus are covered under insurance policies. 'Our cases have concluded that an injury is nonaccidental only where the result was actually, not constructively intended i.e., *more than recklessness*.'

*Worcester Ins. Co. v. Fells Acres Day School, Inc.,* 408 Mass. 393, 411 (1990)(emphasis in original)(citation to quoted case omitted). Moreover, the SJC has "consistently … stated that the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 84, 469 N.E.2d 797, 799 (1984).

In the underlying state court action filed by Officer Santos against Ostrander, Officer Santos asserts a claim for negligence against Ostrander alleging that his injuries were caused by Ostrander's careless and negligent conduct. Officer Santos also asserts a negligence claim against Crehan alleging that she is liable to him because she consented to Ostrander's use of the Sante Fe and therefore, his careless and negligent conduct can be attributed to her. Presumably, Ostrander had criminal charges filed against him as a result of the events of February 11, 2017, including charges relating to his striking Officer Santos. If so, the specifics of those charges and the ultimate disposition thereof would be relevant to resolving this issue. For example, if Ostrander was charged with assault and battery on a police officer and pled guilty or was convicted based on facts which establish that he intentionally drove at Officer Santos, coverage would be barred. However, regardless of whether/what charges were filed against Ostrander as a

25

result of his striking Officer Santos, on this record it is impossible to determine Ostrander's state of mind or motive. Because I cannot find as a matter of law that Ostrander's actions in striking Officer Santos with the Sante Fe were intentional rather than accidental, I cannot find that coverage is barred on this ground.

**Conclusion**

It is hereby Ordered that:

1. NGM Insurance Company's Motion for Summary Judgment (Docket No. 50) is *granted*; and

2. Plaintiff, NGM Insurance Company's, Motion To Strike Exhibits 17, 18 And 19 Of Luis Santos' Opposition To Plaintiff's Motion For Summary Judgment (Docket No. 59 is *granted*.

**/s/ Timothy S. Hillman**
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**